**IN THE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

BENJAMIN McBROOM,
    Plaintiff,

v.

    Case No. 3:22-cv-03073-JEH

MARK LANDERS, *et al.*,
    Defendants.

## Order

Plaintiff, Benjamin McBroom, filed suit against Defendants, Rodney Boyd and Mark Landers, under 42 U.S.C. § 1983. Pursuant to the Court's Merit Review Order (Doc. 12), Plaintiff stated a First Amendment free exercise claim, First Amendment retaliation claim, and claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") against both Defendants.

This matter is now before the Court on a Motion for Summary Judgment (Doc. 75) filed by Defendants. For the reasons stated herein, Defendants' Motion is GRANTED.

## I

The following background facts are taken from the statement of undisputed facts sections in Defendants' summary judgment motion. Doc. 75, p. 3-38, ¶¶ 1-296. Although Plaintiff timely filed a response (Doc. 78) to Defendants' motion and then was given an additional 10 months in which to file a supplemental response, Plaintiff did not respond to any of Defendants' proposed undisputed material facts nor did Plaintiff propose additional material facts. Pursuant to Local Rule 7.1(D)(2)(b)(6),

Defendants' proposed facts are therefore deemed admitted.[1]

During all times relevant to this case, Plaintiff was a detainee at the Logan County Jail ("the Jail"), Defendant Landers was the Logan County Sheriff, and Defendant Boyd was the Jail Superintendent. Doc. 75, p. 4 ¶ 2, p. 18 ¶ 142, p. 27 ¶ 210.

Plaintiff only ever had personal interactions with Defendant Boyd and never with Defendant Landers. Doc. 75, p. 11 ¶ 69. However, Plaintiff believes that Defendant Landers is legally responsible for all acts by any Jail staff. Doc. 75, p. 11 ¶ 68.

When asked what religion he is during his deposition in this matter, Plaintiff testified: "I don't really know how to answer that question currently. I mean my beliefs encompass beliefs of several religions. I suppose I would practice what's called syncretism of different beliefs." Doc. 75, p. 14 ¶ 98; Doc. 75-1, 68:19-24. Plaintiff agreed that, during the timeframe at issue in this case he has held beliefs from Christianity, Judaism, and Paganism. Doc. 75, p. 14 ¶ 99; Doc. 75-1, 69:2-8.

Dr. Ewald was Plaintiff's spiritual advisor and professional counselor in addition to being one of his pastors. Doc. 75, p. 12 ¶ 72. Dr. Ewald is unsure what religion Plaintiff is or was. Doc. 75, p. 17 ¶ 128.

Dr. Ewald visited Plaintiff many times while Plaintiff was at the Jail, beginning in 2021. Doc. 75, p. 17 ¶ 125. Dr. Ewald has been able to schedule a visit with Plaintiff when he wanted to do so, during available visiting hours at the Jail. Doc. 75, p. 17 ¶ 129.

Plaintiff claims that he was not allowed to see Dr. Ewald for a clergy visit on May 13, 2022. Doc. 75, p. 11 ¶ 64. Plaintiff admits that he was told visits were canceled for everyone during this date, and he understands that the jail disallowed all visits between May 13 and 23, 2022. Doc. 75, p. 11 ¶¶ 65-66. Plaintiff further understands

---

[1] A district court does not abuse its discretion by strictly enforcing local and procedural rules, even against a pro se litigant. *Robinson v. Wexford Health Sources, et al.*, No. 22-1717, 2024 WL 676433, at *2 (7th Cir. Feb. 20, 2024) (unreported), citing *McCurry v. Kenco Logistics Services, LLC*, 924 F.3d 783, 737 n.2 (7th Cir. 2019).

that visits were shut down for COVID, but he testified that he never believed clergy visits were canceled. Doc. 75, p. 11 ¶ 67.

Dr. Ewald attests that he decided to no longer visit Plaintiff for his own personal reasons, not due to any conversations he had with Defendants nor to the length of clergy visits. Doc. 75, p. 17-18 ¶¶ 130, 132, 134. Defendant Landers met with Dr. Ewald at Ewald's request, following the Lincoln City Policy requesting return of evidence from Ewald in Plaintiff's underlying criminal case. Doc. 75, p. 22 ¶ 169. Dr. Ewald acknowledged that he was aware his visits with Plaintiff were monitored. Doc. 75, p. 22 ¶ 166. Again, the Jail policy provides for monitoring of all visits except with those identified as attorneys for the relevant inmate. Doc. 75, p. 22-23 ¶ 173.

If any clergy visits were unmonitored at any time, this was not pursuant to official Jail policy nor was it authorized by Defendant Landers. Doc. 75, p. 25 ¶ 192. Defendants Landers and Boyd were made aware that, contrary to Jail policy, some staff were adding individuals to the unmonitored, free lists that was reserved for attorneys only. Doc. 75, p. 25 ¶ 193, p. 30 ¶ 233-234. Defendant Landers admits that this practice was likely brought to his attention due to Plaintiff's complaints and Plaintiff's requests that various people be added to the unmonitored, free list. Doc. 75, p. 25 ¶ 194. The Jail consulted with counsel and determined that its policy that only attorney-client calls would be unmonitored and free was proper under the law and should be enforced. Doc. 75, p. 26 ¶ 195. That is, pursuant to Plaintiff's complaints, Defendants Landers and Boyd enforced a pre-existing policy and advised Jail staff to adhere to that policy for all inmates. Doc. 75, p. 30 ¶ 236. Defendant Boyd had all non-attorney numbers removed from the free and unmonitored list. Doc. 75, p. 30 ¶ 238.

Plaintiff filed a grievance on July 15, 2021, complaining of multiple alleged failures to accommodate his religious exercise, including, specifically, that staff had refused to add Dr. Ewald and Kathy Schmidt to the unmonitored and free clergy phone call list. Doc. 75, p. 7 ¶ 38. Plaintiff believed that Defendant Landers retaliated

by removing clergy phone numbers from the free/unmonitored list. Doc. 75, p. 10 ¶¶ 60-61. However, Plaintiff was also aware that all phone calls in the Jail were being recorded—with the exception of attorney-client privileged calls. Doc. 75, p. 10 ¶ 59. Plaintiff believes that all actions taken by staff were done pursuant to Defendant Landers' orders or policies or due to his failure to supervise. Doc. 75, p. 7 ¶ 36.

On July 19, 2021, Plaintiff was transferred to the DeWitt County Jail, which was located approximately 30 minutes from the Logan County Jail. Doc. 75, p. 8 ¶ 39, p. 34 ¶ 267. Plaintiff believes that Defendant Landers retaliated against him by transferring him because Plaintiff allegedly received Defendant Boyd's denial of his July 15 grievance approximately one hour before he was transferred to DeWitt County. Doc. 75, p. 7-8 ¶¶ 34, 39. However, Plaintiff testified in his deposition that he "do[es]n't think the transfer to DeWitt necessarily has much to do with the First Amendment as far as free exercise." Doc. 75, p. 14, ¶. 92; Doc. 75-1, 65:16-18.

The Jail cooperates with other local counties to assist each other in housing inmates when issues arise, such as insufficient space or inmates not getting along with others. Doc. 75, p. 24 ¶ 180-181. DeWitt County voluntarily agrees to accept some of Logan County Jail's inmates when requested, and Logan County does the same for DeWitt. Doc. 75, p. 24 ¶ 180. Defendants Boyd and Landers determined that it was in the best interest of the Jail that Plaintiff be transferred to DeWitt County. Doc. 75, p. 23 ¶ 179. Prior to his transfer, Plaintiff had conflicts with other inmates at the Logan County Jail, in which Plaintiff alleged he was assaulted by another inmate, asked to be moved to a different cell, and also experienced daily arguments about the television in the Jail. Doc. 75, p. 8 ¶ 42-45.

Plaintiff was only at the DeWitt County Jail for one day before he returned to Logan County. Doc. 75, p. 8 ¶ 46. DeWitt County asked Logan County to take Plaintiff back, which Defendants did in order to maintain a favorable relationship with DeWitt County. Doc. 75, p. 24 ¶ 182.

The Jail's visitation policy limits all visits to 30 minutes. Doc. 75, p. 27 ¶ 211.

Plaintiff filed a grievance on August 17, 2021, complaining that a non-party officer cut one of his clergy visits short, at approximately 26 minutes. Doc. 75, p. 4 ¶ 11, p. 5 ¶ 13, p. 7 ¶ 30. Defendant Landers does not recall if he saw the August 17 grievance himself in 2021, and Plaintiff's grievances appear to have been answered by Defendant Boyd. Doc. 75, p. 22 ¶ 167.

Plaintiff alleges that immediately after he filed his grievance Defendant Landers retaliated by limiting clergy visits to 30 minutes. Doc. 75, p. 5 ¶¶ 13-14. Plaintiff is aware that the Logan County Jail inmate handbook indicates that religious visits are to last 30 minutes. Doc. 75, p. 5 ¶ 15. However, Plaintiff alleges that prior to his grievance being filed clergy had previously been allowed to meet with him for varying lengths of time, including for hours at a time, because Jail staff did not follow or enforce the 30-minute limit. Doc. 75, p. 5-6 ¶¶ 14, 17, 21. Plaintiff believes that the clergy visit policy changed after he filed his grievance, but he does not know what the written policy was prior to the 30-minute policy. Doc. 75, p. 5 ¶ 18.

Defendant Landers attests that the Jail's clergy visitation policy, limiting visits to one 30-minute visit at least once per week, was in existence when he became Sheriff. Doc. 75, p. 19 ¶ 149. He did not modify that policy. Doc. 75, p. 19 ¶ 150. Defendant Landers did not change the time limits on Plaintiff's clergy visits, which were set in the handbook. Doc. 75, p. 23 ¶ 176. Further, Defendant Landers is not aware that Plaintiff ever requested additional time for a visit. Doc. 75, p. 25 ¶ 200.

Defendant Landers did not consider the policy to be a religious restriction, so alternative time limits were not considered. Doc. 75, p. 20 ¶ 152. Inmates at the Jail may have visitors (clergy or non-clergy) during regular visiting hours for 30 minutes once per week on a weekday. Doc. 75, p. 23 ¶ 177. In addition to regular weekday visiting hours, the Jail also allowed additional clergy-only visits on Saturdays from 1 to 2 pm. Doc. 75, p. 20 ¶ 153. That is, clergy members may come both during regular visiting hours and also during clergy weekend hours. Doc. 75, p. 23 ¶ 177. Put differently, one clergy member could typically visit an inmate two times per week

(once on a weekday and once on a Saturday), or two different clergy could visit once per week. Doc. 75, p. 31-32 ¶ 250. In response to his July 15, 2021, grievance, Plaintiff was also advised by Defendant Boyd that if Saturday clergy visits did not work then other dates could be approved with a request made in advance. Doc. 75, p. 24 ¶ 185, p. 28 ¶ 216. In addition, if scheduled in advance video visits can be conducted for 20 minutes during any day of the week, for a fee of $7.00. Doc. 75, p. 32 ¶ 256.

Defendant Boyd has not received a specific request from Plaintiff or clergy to visit Plaintiff on any specific date outside of the regular visiting hours. Doc. 75, p. 32 ¶ 251. Further, Defendant Boyd has not received a request from any clergy to visit with Plaintiff by video. Doc. 75, p. 33 ¶ 259.

Defendant Landers is aware that Jail staff have allowed clergy visits to exceed the 30 minutes stated in the policy, and he has not interfered with staff discretion in allowing some visits to last longer if they do not interfere with Jail operations. Doc. 75, p. 20 ¶ 154, p. 23 ¶ 176.

Defendant Landers was made aware that Plaintiff had begun listing multiple persons as his clergy and was concerned that Plaintiff and other inmates might be attempting to name non-clergy to obtain additional visits to circumvent the Jail's visit policies. Doc. 75, p. 20 ¶ 155. Defendant Landers spoke with other sheriffs and learned from the Kankakee County Sheriff that they had their clergy visitors complete a form verifying their church affiliation before coming into the jail. *Id.* Logan County Jail used this form for a period of approximately six months to verify requests to place clergy members on the list that entitled them to an extra visit on Saturdays. Doc. 75, p. 20-21 ¶¶ 155-156. At no time did any Jail staff deny a visit based upon information obtained in those verification forms, nor did any clergy complain or refuse to complete the forms. Doc. 75, p. 21 ¶¶ 158-159. Pastor Palmer, Thomas Ewald, and Kathy Schmidt all completed the forms. Doc. 75, p. 21 ¶ 161. The Jail never banned Palmer, Ewald, or Schmidt from visiting Plaintiff. Doc. 75, p. 21 ¶ 162.

Plaintiff alleges that on August 21, 2021, Pastor Palmer told Plaintiff that

Defendant Landers informed him that clergy visits were limited to one clergy person and that clergy were required to present different forms of identification. Doc. 75, p. 4 ¶ 6, p. 9 ¶¶ 48, 52. Plaintiff admits that no requirements were placed on Plaintiff to complete additional forms or the like. Doc. 75, p. 9 ¶ 50. Plaintiff does not know if Defendant Landers saw his August 17, 2021, grievance before Defendant Landers had a conversation with Pastor Palmer. Doc. 75, p. 4 ¶ 11. Plaintiff did not witness the conversation between Defendant Landers and Pastor Palmer but believes that Defendant Landers approached Palmer as an act of retaliation against Plaintiff for filing the grievance. Doc. 75, p. 4-5 ¶¶ 3, 5, 12.

Defendant Landers indicates that he had a conversation with Pastor Palmer by telephone, in which he asked whether Kathy Schmidt was a clergy member associated with Pastor Palmer's church. Doc. 75, p. 19 ¶ 146. Defendant Landers attests that he only questioned whether Ms. Schmidt was a clergy member because he had only known her in a different capacity, as a City Council member. Doc. 75, p. 19 ¶ 147. He also needed to verify her credentials because of the unusual request that both Plaintiff and his criminal co-defendant requested to visit with Ms. Schmidt on the same day. *Id*. Ms. Schmidt was added to the clergy visit list. Doc. 75, p. 23 ¶ 175.

Even after the August 2021 conversations regarding additional requirements for or limitations on clergy visits, Plaintiff continued to have visits with Dr. Ewald and Kathy Schmidt. Doc. 75, p. 9 ¶¶ 53-54. Plaintiff never requested to see multiple clergy during the same visit. Doc. 75, p. 10 ¶ 55. Plaintiff testified in his deposition in this case that he may have had one more visit with Palmer sometime during 2021 but that he has since lost contact with Palmer. Doc. 75, p. 4 ¶¶ 7-8.

Plaintiff admitted in his deposition that he could have clergy visits at the Jail, but that he had not had one for a long time. Doc. 75, p. 6 ¶ 23. Plaintiff also admitted that there are no clergy or other members of his religious community who are claiming that they are trying to visit him but have not been allowed to visit. Doc. 75, p. 12-13 ¶¶ 76, 82.

The Jail allows inmates to request religious materials and publications and have them sent in or ordered through an online service at any time. Doc. 75, p. 28 ¶ 217. Defendants denied Plaintiff's request for a CD player and a CD to watch a specific religious service, due to safety and security of the facility. Doc. 75, p. 22 ¶ 170. CDs can be broken and then used as weapons because they are sharp when broken. Doc. 75, p. 22 ¶ 171. Plaintiff was allowed to obtain religious materials within the Jail, but receiving objects directly from others was generally prohibited. Doc. 75, p. 22 ¶ 172. For example, the Jail most likely would not allow a visitor to hand a Bible to an inmate, but a Bible could be mailed to the Jail, inspected, and then given to the inmate. Doc. 75, p. 28 ¶ 218.

In sum, Plaintiff testified in his deposition that his claims in this case arose from: an inability to call his pastor(s) unmonitored and for free, time limits on his clergy visits, and requests for sacraments that were not granted. Doc. 75, p. 15 ¶¶ 103-109. Defendant Landers attests that Plaintiff never asked him for an opportunity to partake in confession or baptism. Doc. 75, p. 26-27 ¶¶ 202, 204. Several baptisms have occurred at the Jail during the relevant time period, and Plaintiff did not request to be a part of those ceremonies. Doc. 75, p. 27 ¶ 205.

Defendants' position is that no new actions or retaliatory actions were taken in response to Plaintiff's complaints; rather, existing policies were enforced as written. Doc. 75, p. 36 ¶ 286, p. 37 ¶ 289.

## II

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All facts must be construed in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in his favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to be a "genuine" issue, there must

be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III

## A

As previously summarized, the Court allowed Plaintiff to proceed on a claim for restrictions on the exercise of his religion in violation of both the First Amendment and RLUIPA.

The First Amendment's "Free Exercise Clause prohibits the state from imposing a 'substantial burden' on a 'central religious belief or practice.'" *Kaufman v. Pugh*, 833 F.3d 692, 696 (7th Cir. 2013), *quoting Kaufman v. McCaughtry*, 419 F.3d 678, 682-83 (7th Cir. 2005). Under the First Amendment, a regulation that imposes a substantial burden on an inmate or detainee's religious exercise "may be justified if it is 'reasonably related to legitimate penological interests.'" *Kaufman*, 733 F.3d at 696, *quoting O'Lone v. Shabazz*, 482 U.S. 342, 349 (1987).

RLUIPA likewise prohibits the imposition of a substantial burden[2] on religious exercise of prisoners—"even if the burden results from a rule of general applicability"—unless the government demonstrates that the regulation "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C § 2000cc-1(a).

In short, a substantial burden on religious exercise does not violate the First Amendment if it is *reasonably* related to a *legitimate* government interest, but it would still violate RLUIPA unless it were the *least restrictive* means of furthering a *compelling* government interest. *See Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012) (RLUIPA

---

[2] To be "substantial," the burden need not render religious exercise "effectively impracticable." *Schlemm v. Wall*, 784 F.3d 362, 364 (7th Cir. 2015).

"confers greater religious rights on prisoners than the [First Amendment's] free exercise clause has been interpreted to do").

Here, Plaintiff asserts the following burdens on his religious exercise: an inability to call his clergy unmonitored and for free, time limits on his clergy visits, and requests for sacraments (communion, baptism, and/or confession) that were not granted.

As an initial matter, the Court plainly held in its Merit Review Order that Plaintiff could not proceed on any claim based upon the monitoring of his communications with clergy. Doc. 12, p. 15. Therefore, the Court does not consider any further arguments regarding whether that policy violated Plaintiff's rights.

Next, the Court observes that RLUIPA authorizes injunctive relief, not money damages. *Nelson v. Miller*, 570 F.3d 868, 885 (7th Cir. 2009). Therefore, upon a plaintiff's release from the defendants' custody, a claim for injunctive relief under RLUIPA is moot. *Id.* at 882 ("A court's power to grant injunctive relief only survives if such relief is actually needed."); *Grayson*, 666 F.3d at 451. Here, Plaintiff is no longer in the custody of Defendants at the Logan County Jail. Rather, the record reflects that he is currently incarcerated within the Illinois Department of Corrections ("IDOC") at Lawrence Correctional Center. Therefore, Plaintiff's RLUIPA claim is moot. *See Grayson*, 666 F.3d at 451 (holding that "the Act can no longer do [a plaintiff] any good" when "he's since been released from prison").

Therefore, the Court considers only whether Defendants violated Plaintiff's First Amendment rights when they limited clergy visits to 30 minutes twice per week and where Plaintiff alleges that his requests to engage in certain sacraments were denied.

Addressing Plaintiff's latter allegation first, the record simply contains no evidence whatsoever that he ever requested—or that Defendants ever denied him— any sacraments. In order to successfully oppose a motion for summary judgment, the non-moving party must do more than raise a metaphysical doubt as to the material

facts. *Michael v. St. Joseph Cty.*, 259 F.3d 842, 845 (7th Cir. 2001). In this case, then, Plaintiff "must present definite, competent evidence to rebut" Defendants' motion. *Id.* at 845. Put differently, "summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Plaintiff has not done so as it relates to any allegation that Defendants denied him access to religious sacraments.

As for the time limitations on inmate visits with clergy, Plaintiff has never specified what religious belief or practice was burdened by the Jail policy allowing for twice-weekly visits of approximately 30 minutes each. Again, summary judgment is the "put up or shut up moment," yet Plaintiff has failed to identify any religious practices that he was unable to exercise due to time limits on his clergy visits. In addition, the record reflects no requests whatsoever by Plaintiff to request accommodations in the form of different or additional days or times for visits nor to utilize video visits with clergy on additional days and times.

For these reasons, Defendants are entitled to summary judgment in their favor on Plaintiff's First Amendment Free Exercise claim and RLUIPA claim.

**B**

Finally, the Court turns to Plaintiff's First Amendment retaliation claim.

To prevail on a First Amendment retaliation claim, a prisoner must show that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009), *quoting Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008).

There is no doubt that Plaintiff engaged in activity protected by the First Amendment when he filed grievances in July and August 2021 complaining of multiple alleged failures to accommodate his religious exercise. *See Watkins v. Kasper*,

599 F.3d 791, 798 (7th Cir. 2010).

Second, Plaintiff alleges that he suffered deprivations in the form of removal of his clergy from free, unmonitored calls list; limitation of his clergy visits to 30 minutes; and transfer to the DeWitt County Jail for one day.

As it relates to Plaintiff being refused access to free, unmonitored calls with his clergy and having his visits with clergy limited to 30 minutes, the record clearly establishes that both of these restrictions were longstanding policies that predated Defendants' tenure in their leadership roles at the Jail. Defendants admit that Plaintiff's grievances may have brought staff members' inconsistency in actually enforcing those policies to the attention of Defendants. However, Defendants then took steps to uniformly enforce those policies after Plaintiff advised them of deviations from the policies—rather than targeting Plaintiff in an act of retaliation for his specific grievances or complaints. *See, e.g., Holleman v. Zatecky*, 951 F.3d 873, 879 (7th Cir. 2020) ("Establishing the causation element of retaliation requires a showing that the *fact* of the plaintiff's engagement in protected activity was a motivating factor of the alleged adverse action, not merely that the *substance* of the plaintiff's complaint motivated a response the plaintiff did not particularly like."). In short, there is no evidence in the record that Defendants' decision to enforce preexisting policies was a targeted response to Plaintiff's act of complaining about those very policies.

Finally, even if Plaintiff could show that his transfer just thirty minutes away to the DeWitt County Jail for a single day was a "deprivation" as contemplated under the First Amendment, *see Holleman v. Zatecky*, 2019 WL 385333, at *5, *citing O'Neal v. City of Chicago*, 392 F.3d 909, 911-12 (7th Cir. 2004), Plaintiff has admitted that he does not believe the transfer to DeWitt ever had "much to do" with his complaints regarding his religious exercise.

## IV

For the foregoing reasons, Defendants' Motion for Summary Judgment [75] is GRANTED. Summary judgment shall enter in favor of Defendants and against

Plaintiff.

If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal in forma pauperis MUST identify the issues Plaintiff wishes to present on appeal, to assist the Court in determining whether the appeal is taken in good faith. *See* Fed. R. App. P. 24(a)(1)(c); *see also Celske v Edwards*, 164 F.3d 396, 398 (7th Cir. 1999) (an appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a reasonable assessment of the issue of good faith."); *Walker v. O'Brien*, 216 F.3d 626, 632 (7th Cir. 2000) (providing that a good faith appeal is an appeal that "a reasonable person could suppose…has some merit" from a legal perspective). If Plaintiff does choose to appeal, he will be liable for the $605.00 appellate filing fee regardless of the outcome of the appeal. If the Court allows him to proceed on appeal in forma pauperis that finding would allow Plaintiff to pay the appellate filing fee over time but would not release him from having to pay the fee.

This case is terminated.

*It is so ordered.*

Entered on July 30, 2025.

s/Jonathan E. Hawley
U.S. DISTRICT JUDGE